**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**July 28, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2017AP2288-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2005CF381

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

STEVEN A. AVERY,

DEFENDANT-APPELLANT.

APPEAL from orders of the circuit court for Manitowoc County: ANGELA W. SUTKIEWICZ, Judge. *Affirmed*.

Before Neubauer, C.J., Reilly, P.J., and Davis, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. In 2007, following a jury trial, Steven A. Avery was convicted of first-degree intentional homicide, party to the crime, and possession of a firearm by a felon. We affirmed his convictions on appeal. The issues in this new case concern collateral proceedings: whether the circuit court erred in denying Avery's WIS. STAT. § 974.06 (2019-20)[1] motion and two supplemental motions without a hearing, as well as his motions to vacate and for reconsideration of the first of these motions. We hold that Avery's § 974.06 motions are insufficient on their face to entitle him to a hearing and that the circuit court did not erroneously exercise its discretion in denying the motions to vacate and for reconsideration. Accordingly, we affirm.

## OVERVIEW

¶2 We previously summarized the facts of this case in our decision on Avery's direct appeal, *see State v. Avery*, 2011 WI App 124, 337 Wis. 2d 351, 804 N.W.2d 216, and we will discuss below those facts relevant to his collateral attack on his conviction. But for context, this case began in early November 2005 with the disappearance of Teresa Halbach, a twenty-five-year-old professional photographer. Volunteer searchers found Halbach's RAV4 on the forty-acre site of Avery's Auto Salvage, a salvage yard business where Avery and other family members lived and worked. It was believed that Halbach had photographed vehicles at this site several days earlier, per Avery's request. According to State witness Bobby Dassey, Halbach was last seen walking towards Avery's trailer.

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶3 After finding the RAV4, police searched the Avery property and, over the course of the next four months, discovered and identified evidence including: burned bone fragments in and around a burn pit, with DNA matching Halbach's; both Avery's and Halbach's blood in the RAV4; the remnants of electronic devices and a camera, the same models as Halbach's, in a burn barrel; Halbach's RAV4 key in Avery's bedroom, with Avery's DNA on it; Avery's DNA on the hood latch of the RAV4 (deposited, the State later claimed, by Avery's sweaty hands); and a bullet and bullet fragments in Avery's garage, containing Halbach's DNA.

¶4 The case was tried over a five week period in February and March of 2007. The State's theory was that Avery shot Halbach in the head, in his garage, and threw her in the cargo area of the RAV4. He then burned the electronics and camera, cremated Halbach in a burn pit, transferred the remains to a burn barrel, and hid the RAV4 until he could crush it in the Avery car crusher. The defense argued that law enforcement was biased against Avery, who was pursuing a wrongful conviction lawsuit against Manitowoc County and the Sheriff's Department,[2] and, as a result, planted evidence implicating Avery. The real killer, the defense argued, took advantage of this "investigative bias" to also plant evidence on the Avery property, once early media publicity made it clear that Avery was a key suspect.

¶5 The jury found Avery guilty of first-degree intentional homicide and felon in possession of a firearm. Avery received a life sentence without the

---

[2] Avery was wrongfully convicted of a 1985 sexual assault and was exonerated in 2003 on the basis of DNA evidence linking the crime to another person.

possibility of extended supervision. In 2009, Avery commenced his direct appeal by filing a motion for postconviction relief, pursuant to WIS. STAT. § 974.02, requesting a new trial. That motion was denied, Avery appealed, and this court affirmed in the aforementioned decision. *See Avery*, 337 Wis. 2d 351, ¶3.

¶6    In 2013, Avery filed a pro se WIS. STAT. § 974.06 motion (the 2013 motion), requesting a new trial. That motion was denied, and Avery appealed. That appeal was stayed and later dismissed on Avery's motion, shortly after he initiated the postconviction proceedings that are the subject of this appeal. In 2017, Avery filed the first of the six motions that are the subject of this appeal.[3] These motions will be analyzed individually, with further discussion of relevant law, but some basic principles apply generally.

¶7    WISCONSIN STAT. § 974.06 provides a mechanism for vacating, setting aside, or correcting a sentence once the time for direct appeal has passed, on constitutional or jurisdictional grounds or where "the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack." Sec. 974.06(1); *State v. Romero-Georgana*, 2014 WI 83, ¶32, 360 Wis. 2d 522, 849 N.W.2d 668. Section 974.06(4),[4] however, creates a procedural barrier to

---

[3] Avery's appeal is from two orders: the circuit court's October 3, 2017 order denying his June 2017 postconviction motion and the court's November 28, 2017 order denying his motions to vacate and for reconsideration of the June 2017 motion. We address these as Motions #1 through #3. After filing his appeal, Avery moved to supplement the appellate record, and to stay the appeal and remand, in two separate motions. We retained jurisdiction and directed Avery to raise his claims to the circuit court in the form of supplemental postconviction motions. We address these as Motions #4 and #5. In April 2021, Avery filed a motion to this court to stay his appeal and remand. We have not yet acted on that motion, so we address and decide it as Motion #6.

[4] In full, WIS. STAT. § 974.06(4) states:

(continued)

4

review, in that it requires the defendant to raise all grounds for relief in his or her first (postconviction or appellate) motion. *State v. Balliette*, 2011 WI 79, ¶¶35-36, 336 Wis. 2d 358, 805 N.W.2d 334. Thus, a defendant is normally barred from raising issues in a § 974.06 motion that were *or could have been* raised on direct appeal or in a previous § 974.06 motion. *State v. Escalona-Naranjo*, 185 Wis. 2d 168, 181-82, 517 N.W.2d 157 (1994). An exception to this rule exists where the defendant can show a "sufficient reason" for not raising the issue in any prior postconviction proceeding. *Id.*; § 974.06; *Romero-Georgana*, 360 Wis. 2d 522, ¶¶48-50.

¶8 Where, as here, a defendant appeals the circuit court's denial of a WIS. STAT. § 974.06 motion *without* an evidentiary hearing, then the question before us is narrow: whether remand for a hearing is warranted because the circuit court erred in denying the motion on its face. *See Balliette*, 336 Wis. 2d 358, ¶38. Pursuant to § 974.06(3)(c), the court shall "[g]rant a prompt hearing" unless "the motion and the files and records of the action conclusively show that the [defendant] is entitled to no relief." Our supreme court has also determined, however, that a baseline level of specificity applies to all postconviction motions, including those under § 974.06. *See Balliette*, 336 Wis. 2d 358, ¶¶42-43, 58-59. Thus, in order for the reviewing court to meaningfully assess the claim, the

All grounds for relief available to a person under this section must be raised in [the defendant's] original, supplemental or amended motion. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the person has taken to secure relief may not be the basis for a subsequent motion, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original, supplemental or amended motion.

defendant must allege "sufficient material facts—*e.g.*, who, what, where, when, why, and how—that, if true, would entitle [the defendant] to the relief he [or she] seeks." *State v. (John) Allen*, 2004 WI 106, ¶¶2, 23, 274 Wis. 2d 568, 682 N.W.2d 433; *Romero-Georgana*, 360 Wis. 2d 522, ¶37. This requirement promotes finality once the defendant has been convicted and sentenced, "minimize[s] time-consuming postconviction hearings unless there is a clearly articulated justification for them," and recognizes that "the pleading and proof burdens … have shifted to the defendant in most situations after conviction." *Balliette*, 336 Wis. 2d 358, ¶¶53, 58. Accordingly, in the context of a § 974.06 motion, the defendant must describe, with specificity, his or her "sufficient reason" for failing to raise the claim in any earlier proceeding—that is, the defendant must show why his or her claim is not procedurally barred under § 974.06(4).[5] *See Romero-Georgana*, 360 Wis. 2d 522, ¶37.

¶9 We will further discuss some of the contours of this "sufficient reason" exception below, but one point bears mentioning here: ineffective assistance of postconviction counsel can be, and often is, cited as the reason for the defendant's not bringing some claim on direct appeal. The specificity requirement, however, applies just as much in this context. The defendant cannot merely present legal conclusions, summarily arguing that postconviction counsel was ineffective for failing to bring the claims he or she now views as meritorious. *Id.*, ¶¶36, 42. Instead, to be entitled to a hearing, the defendant must raise sufficient material facts demonstrating prior counsel's ineffectiveness—that is,

---

[5] Of course, a defendant is not required to do so when there has been no prior postconviction proceeding. *See State v. Romero-Georgana*, 2014 WI 83, ¶35, 360 Wis. 2d 522, 849 N.W.2d 668

that counsel was constitutionally deficient and that such performance was prejudicial to the defendant. *Id.*, ¶¶37-39, 56; *see Strickland v. Washington*, 466 U.S. 668, 687 (1984). Importantly, to show deficiency in this context, the defendant must allege sufficient facts showing that his or her new claim is "clearly stronger" than the claims postconviction counsel in fact brought. *Romero-Georgana*, 360 Wis. 2d 522, ¶¶45-46.

¶10 Whether the circuit court erred in not ordering a hearing involves two potential inquiries, with separate standards of review. The circuit court *must* hold a hearing where the motion is sufficient on its face, unless the record as a whole otherwise conclusively demonstrates that the defendant is not entitled to relief. *Balliette*, 336 Wis. 2d 358, ¶¶18, 50; *State v. Howell*, 2007 WI 75, ¶¶75-77 & n.51, 301 Wis. 2d 350, 734 N.W.2d 48. Whether a WIS. STAT. § 974.06 motion meets this standard—including whether there is a "sufficient reason" for overcoming the procedural bar of *Escalona-Naranjo*—is a question of law that we review de novo. *Romero-Georgana*, 360 Wis. 2d 522, ¶30. If, on the other hand, the motion does not raise sufficient facts, "or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief," then the circuit court has the discretion to grant or deny a hearing. *Balliette*, 336 Wis. 2d 358, ¶18 (quoting *John Allen*, 274 Wis. 2d 568, ¶9). In such case, we review for an erroneous exercise of discretion. *Romero-Georgana*, 360 Wis. 2d 522, ¶30.

## MOTION #1: JUNE 2017 MOTION

¶11 In August 2016, Avery, now represented by counsel, brought a motion for postconviction scientific testing. In November 2016, the circuit court granted the motion, permitting Avery to conduct independent testing of nine trial

exhibits: seven samples of bloodstain cuttings, swabs, or blood flakes taken from Halbach's RAV4; Halbach's RAV4 key; and a 1996 sample of Avery's blood.

¶12    Based largely on the results of this testing and other investigations, Avery filed a WIS. STAT. § 974.06 motion in June 2017 (the June 2017 motion), requesting a new trial.  His motion raises a number of claims[6] falling into three categories for purposes of overcoming the *Escalona-Naranjo* procedural bar. First, Avery alleges that trial counsel was ineffective for failing to fully investigate, or present expert testimony in support of, his theory that he was framed.  Second, he brings several claims based on alleged *Brady*[7] violations. Third, he raises claims based on the results of new investigations of a bullet, the hood latch swab of the RAV4, and the RAV4 key, all of which he characterizes as newly discovered evidence.

¶13    The circuit court found that most of these claims were procedurally barred under *Escalona-Naranjo* because Avery had not alleged a "sufficient reason" for not raising them in his 2013 motion or on direct appeal.  *See Escalona-Naranjo*, 185 Wis. 2d at 181-82.  The court further held that the claims based on "new scientific tests," when considered in the context of the full record, did not allege sufficient facts that, if true, would entitle Avery to relief.  *See Romero-Georgana*, 360 Wis. 2d 522, ¶37. The court noted that the new reports on

---

[6] Avery reframes some of these claims and arguments on appeal, but our review is of the sufficiency of the underlying motion.  We analyze that motion on its face, deeming new or newly argued issues forfeited.  *See State v. Huebner*, 2000 WI 59, ¶¶10-12 & n.2, 235 Wis. 2d 486, 611 N.W.2d 727.  In addition, some of Avery's claims, such as his allegations of prosecutorial misconduct, are not renewed on appeal; these we deem abandoned and will not discuss.  *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998).  These principles apply to our analyses of Avery's subsequent motions.

[7] *Brady v. Maryland*, 373 U.S. 83 (1963).

the bullet, hood latch swab, and key were "equivocal in their conclusions" and "ambiguous"; therefore, given "the totality of evidence submitted at trial … it cannot be said that a reasonable probability exists that a different result would be reached at a new trial based on these reports." Accordingly, the court denied Avery's motion without a hearing.

¶14 We review the sufficiency of this motion de novo; if we determine that Avery was not entitled to a hearing as a matter of law, we then review the circuit court's decision to deny him a hearing for an erroneous exercise of discretion. *See id.*, ¶30. The first, threshold step in this analysis is determining whether Avery has stated a sufficient reason for not raising these claims in his 2013 motion and on direct appeal.

*Ineffective Assistance of Trial Counsel*

¶15 Avery's claims relating to ineffective assistance of trial counsel are not—and cannot—be based on new or newly disclosed evidence unavailable to trial counsel. By definition, these claims are based on alleged errors of trial counsel, the argument being that Avery was thereby denied his constitutional right to counsel. As with any WIS. STAT. § 974.06 claim, Avery must show that there was a "sufficient reason" that these claims were not raised on direct appeal and in his 2013 pro se motion. *See Escalona-Naranjo*, 185 Wis. 2d at 181-82. And to establish a "sufficient reason" for not raising ineffective assistance of trial counsel claims on direct appeal, Avery must show that his new claims are "clearly stronger" than the claims postconviction counsel actually brought. *See Romero-Georgana*, 360 Wis. 2d 522, ¶¶45-46.

¶16 We begin by considering whether Avery has shown a sufficient reason for not having raised these claims in his 2013 pro se petition. We then turn

to whether Avery has shown a sufficient reason for not raising these claims on direct appeal. It is at this point that the ***Escalona-Naranjo*** analysis dovetails with the merits of Avery's ineffective assistance of trial counsel claims, because if his new claims are facially insufficient as a matter of law, then postconviction counsel cannot have been ineffective for failing to raise them on direct appeal. Therefore, after we analyze the potential procedural bar of the 2013 petition, we turn directly to whether Avery's remaining claims demonstrate a reasonable probability that, but for trial counsel's unprofessional errors, he would not have been convicted at trial. *See **Strickland***, 466 U.S. at 694.

Sufficient reason for failure to raise the claims in the 2013 motion

¶17 As a starting point, although Avery may argue ineffective assistance of postconviction counsel as a sufficient reason for not raising these claims on direct appeal, that argument is *not* available to excuse failings in his 2013 motion. That is because Avery did not have a constitutional right to counsel following his direct appeal. As our supreme court recently observed, there is no constitutional right to counsel on a collateral attack and, consequently, the "vast majority" of WIS. STAT. § 974.06 motions are filed by pro se litigants. *See **State ex rel. Wren v. Richardson***, 2019 WI 110, ¶27 & n.21, 389 Wis. 2d 516, 936 N.W.2d 587. The exception would swallow the rule if the mere assertion of pro se status were sufficient to overcome the procedural barrier of ***Escalona-Naranjo***. This legal point precludes successive postconviction motions from turning into something akin to Russian nesting dolls, wherein a litigant can simply allege a continuous series of ineffective assistance of counsel claims to justify previous failures to raise an issue. Instead, where there are successive § 974.06 motions, any new motion must be based on something other than ineffective assistance of postconviction counsel.

¶18    Avery appears to recognize this point, foregoing any claim based on the mere fact that he was without counsel. Nonetheless, his June 2017 motion largely focuses on the quality of his self-representation, providing the following justification for not raising any of his current claims in his pro se 2013 motion:

> [N]umerous unique circumstances are present here that provide sufficient reasons the current claims were not previously presented. Mr. Avery had no way of knowing the factual and legal basis [for] the claims set forth herein. As a learning disabled, indigent prisoner, Mr. Avery simply could not have known them. His attempt to file a meritorious pleading was thwarted by his lack of legal knowledge.
>
> The current motion is the product of over a thousand hours of attorney time, hundreds of hours expended by private investigators, numerous consultations with experts, the expenditure of funds to retain those experts, and more. To expect an indigent prisoner acting *pro se* to compile a meritorious motion under these circumstances would be unreasonable. Mr. Avery's lack of legal knowledge, cognitive deficiencies and the complexity of this unique case provide the sufficient reason that the current claims should be addressed on the merits.

Thus, we construe Avery to offer six (somewhat overlapping) explanations that, taken together, might provide a sufficient reason for not raising his claims in 2013: (1) he was unaware of the legal basis for the claims, (2) he was unaware of the factual basis for the claims, (3) he was acting pro se, (4) he was indigent, (5) he has a learning disability, and (6) this case is particularly complex.

¶19    These explanations do not justify Avery's failure to bring the majority of his claims. Again, the quality of Avery's representation in his prior motion cannot in and of itself constitute a sufficient reason for not raising an issue earlier. Accordingly, we reject Avery's first argument that he "lacked awareness of the legal basis for a claim." "Lack of awareness of the legal basis for a claim" is a term of art that does not merely mean that Avery was not a lawyer or lacked

legal knowledge. Rather, it means that he could not previously have anticipated a change in the substantive law that opened up a new basis for collateral attack. *See State v. (Aaron) Allen*, 2010 WI 89, ¶44, 328 Wis. 2d 1, 786 N.W.2d 124; *State v. Howard*, 211 Wis. 2d 269, 287-88, 564 N.W.2d 753 (1997), *overruled on other grounds by State v. Gordon*, 2003 WI 69, 262 Wis. 2d 380, 633 N.W.2d 765. Here, Avery's claims are based on well-settled law. *See, e.g., Romero-Georgana*, 360 Wis. 2d 522, ¶¶39-41.

¶20　As to reasons (2) through (6), Avery gives us bare-bones factual conclusions but does not meaningfully explain why the circumstances he describes precluded him from raising most of these issues earlier. *See John Allen*, 274 Wis. 2d 568, ¶¶12, 23. Regarding reason (2), unawareness of the factual basis of the claims, Avery does not explain, and we cannot envision, why he did not have all the facts necessary in 2013 to raise these claims (which, after all, are premised on the further investigation of evidence and witnesses known to Avery at the time of trial). *See State v. Tolefree*, 209 Wis. 2d 421, 426, 563 N.W.2d 175 (Ct. App. 1997). As to reason (3), as explained above, a defendant's pro se status, standing alone, cannot excuse his or her failure to raise claims in a WIS. STAT. § 974.06 motion.

¶21　With one exception—discussed below—Avery's remaining reasons are similarly deficient. Avery simply claims that he has a learning disability and was indigent in 2013, and that his case is complex. He does not cite any law, or develop any detailed argument, as to why these facts, alone or taken together, explain his failure to raise these claims. It appears well established from federal habeas law, from which we can borrow, that reasons such as these are not the sort of grounds on which a procedural bar can be avoided. *See Harris v. McAdory*, 334 F.3d 665, 668-69 (7th Cir. 2003) (petitioner's pro se status, borderline mental

retardation, and organic brain dysfunction did not provide sufficient cause to excuse procedural default of ineffective assistance claim; cause must be based on an "external impediment").

¶22     The one exception we will recognize concerns Avery's contention that, on his own, it would have been impossible for him to have undertaken the extensive investigations later carried out by current postconviction counsel, which resulted in new theories as to how he was framed and additional factual support for previous theories.  For example, if Avery believed that forensic testing would have shown that his DNA was planted on the RAV4 key, he of course could have raised the issue in his 2013 motion.  But to do so with any chance of success, he would have had to allege that postconviction counsel was ineffective for not raising an ineffective assistance of *trial* counsel claim on that basis, and to succeed on *that* claim, he would have had to show that this new claim was "clearly stronger" than those actually brought on direct appeal.  *See* ***Romero-Georgana***, 360 Wis. 2d 522, ¶¶45-46.  Absent forensic testing supporting the basis for such a showing, this would be an all but impossible task.  Thus, "unique circumstances" might exist wherein a pro se defendant is unable to perform or pay for an investigation but later gains the resources to uncover new material facts and develop alternative theories of the crime and, on that basis, can claim a sufficient reason for not previously raising claims based on those theories.  We do not perceive the policies underlying ***Escalona-Naranjo***—namely, the need for finality in litigation—to preclude this result.  Indeed, to hold otherwise could unfairly punish defendants who bring postconviction motions based on all facts known to or reasonably discoverable by them.  For ***Escalona-Naranjo*** purposes, claims based on newly conducted investigations, which could not have been previously undertaken, would appear to be little different than claims based on newly

discovered evidence, *see* ¶43, and we will treat them as such in determining whether they are procedurally barred by virtue of Avery's prior pro se postconviction motion.

¶23     That said, the majority of Avery's ineffective assistance of trial counsel claims are *not* based on investigations that Avery, now represented by counsel, was only recently able to perform.[8]  On the other hand, we have identified

---

[8] There are a number of claims, some overlapping, that cannot be said to be based on new scientific or forensic experiments or investigations by Avery's experts, and which we therefore will not address except to list here.  Several of these claims relate to issues that Avery's new experts did explore—and which we discuss in more detail below—but the claims in this list are not themselves dependent on the results of new investigations.  Several of these claims also appear, superficially, to be based on some new test or experiment (such as a recreation with a key and a bookshelf), but, crucially, these claims are not dependent on Avery's ability to hire new experts, spend money on new tests, etc.  We are allowing Avery to overcome the procedural bar of his 2013 petition by demonstrating that he did not have the resources to earlier uncover the factual bases for his claims, but this cannot extend to simple experiments or recreations that require no expert contribution and/or that could have been easily conducted at some point prior.

(continued)

seven claims, all premised on the results of forensic testing, that could conceivably fall in this category. So as to address, as nearly as allowable, the merits of his motion, we will assume that Avery has alleged a sufficient reason for not raising these seven claims in his 2013 motion. These claims are that trial counsel was ineffective for failing to:

1. Present a blood spatter expert, who would have found that Avery's blood was planted in the RAV4.

2. Present a blood spatter expert, who would have found that Halbach was not thrown in rear of the RAV4 after being fatally injured.

3. Present a blood spatter expert, who would have determined that the theory counsel presented at trial as

---

These claims are that trial counsel was ineffective for failing to: (1) cross-examine some of the State's expert witnesses instead of retaining their own; (2) thoroughly investigate other suspects so as to identify a suspect meeting the requirements of *State v. Denny*, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984); (3) use available evidence supporting the theory that the RAV4 was moved onto Avery's property by the real killer; (4) investigate Avery's pre-trial belief that his blood was taken from blood drippings in his trailer sink and planted in the RAV4 (this claim, standing alone, does not rely on new investigations; we discuss related claims below); (5) present a DNA expert's opinions about blood being planted in the RAV4 (Avery does not indicate that current postconviction counsel retained such an expert; counsel did retain a "blood spatter expert," whose findings form the basis for other claims discussed below); (6) demonstrate that Halbach's key was planted in Avery's bedroom, by recreating how the key was found; (7) demonstrate that the RAV4 key found in Avery's trailer was a subkey or secondary key, as should have been evident from the 1999 Toyota RAV4 manual; (8) detect and raise a Fourth Amendment challenge regarding DNA testing that allegedly violated the scope of a search warrant; (9) investigate a "chain of custody fabrication" that allegedly allowed law enforcement to illegally collect and then plant Avery's DNA on the RAV4 hood latch (we discuss below claims based on the results of experiments on the RAV4 hood latch); (10) present an expert on police practices and investigations, who would have demonstrated errors in the handling of the investigation; (11) conduct "a simple experiment" to demonstrate that a witness could not have smelled burning plastic (Halbach's electronics and camera) in Avery's burn barrel, as the witness testified to at trial; and (12) investigate "a variety of topics," all based on evidence known to counsel before trial. Avery also argues that Halbach's ex-boyfriend was the real killer, but he does not present any cognizable claim based on this argument. That is, Avery speculates that the ex-boyfriend meets the *Denny* "legitimate tendency" test for introducing trial evidence that a third party committed the crime, but without pointing to any true newly discovered evidence, explaining why trial counsel rendered ineffective assistance during his *Denny* hearing in this regard, or otherwise demonstrating why such conclusion entitles him to a new trial.

to how Avery's blood was planted in the RAV4 was untenable.

4. Present a trace materials expert, who would have found that the RAV4 key recovered from Avery's bedroom was Halbach's subkey or secondary key.

5. Present a DNA expert, who would have found that Avery's DNA was planted on the subkey by law enforcement.

6. Present a DNA expert, who would have found that Avery's DNA was planted on the RAV4 hood latch.

7. Present a forensic fire expert, who would have found that Halbach's body was not burned in Avery's burn pit

Merits of Avery's claims of ineffective assistance of trial counsel

¶24 We now turn to whether Avery's ineffective assistance of trial counsel claims have alleged "sufficient material facts—*e.g.*, who, what, where, when, why, and how—that, if true, would entitle [him] to the relief he seeks," *see John Allen*, 274 Wis. 2d 568, ¶2, bearing in mind that he is not entitled to a hearing where the record conclusively demonstrates otherwise, *see Balliette*, 336 Wis. 2d 358, ¶18. In short, Avery must show that a hearing would not be frivolous. *See Romero-Georgana*, 360 Wis. 2d 522, ¶64.

¶25 Avery cannot make this showing. First, he has wholly failed to demonstrate deficient performance: that trial counsel's "representation fell below an objective standard of reasonableness" by counsel's not retaining experts similar to those he later retained. *See Romero-Georgana*, 360 Wis. 2d 522, ¶40 (citation omitted). Avery apparently assumes that his findings speak for themselves and that, given the strength of his later claims, the necessity for such experts should

have been obvious at the time of trial.[9] Avery also assumes, again without explanation, that any experts retained by trial counsel would have reached the same conclusions as his later experts. But even accepting these premises, Avery has not demonstrated prejudice: that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See id.*, ¶41 (quoting *Strickland*, 466 U.S. at 694).

¶26 Avery's first three claims concern trial counsel's failure to retain a blood spatter expert. Avery argues in his motion that counsel was ineffective because such an expert would have found that his "blood was planted in the RAV4." His retained expert's actual findings, however, are not nearly so conclusive. The expert did not conclude that Avery's "blood was planted" or rule out Avery as the source of the blood. Rather, he determined that the presence of Avery's blood was "consistent with being randomly distributed from a source because his blood is present in some locations but absent in some [other] reasonably anticipated locations" and that "[t]he absence of blood stains in these

---

[9] Relatedly, Avery fails to demonstrate how the defense strategies that trial counsel did pursue rendered counsel's performance constitutionally deficient. As an example, he points to trial counsel's failure to obtain a blood spatter expert but does not address why counsel's chosen strategy for explaining the presence of his blood in the RAV4 represented deficient performance *at the time of trial*, without the benefit of hindsight. This is a repeated shortcoming in Avery's briefing, both to the circuit court and on appeal, and represents exactly the type of "Monday-morning quarterbacking" that we strive to avoid in evaluating a claim of ineffective assistance of counsel. *See Weatherall v. State*, 73 Wis. 2d 22, 25-26, 242 N.W.2d 220 (1976) ("[P]ostconviction counsel … stress[es] what he would have done differently had he conducted the defense at time of trial. Our court has called this hindsight-is-better-than-foresight approach to be 'Monday-morning quarterbacking' and has made clear that … it is the right of a defendant and trial counsel to select the particular defense, from among the alternatives available, upon which they elect to rely." (footnotes and citation omitted)); *Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.").

locations is inconsistent with an active bleeder" (the State alleged at trial that Avery's finger was actively bleeding while he was in the RAV4). The expert further determined that the bloodstains were "consistent with an explanation other than Mr. Avery being in the RAV4 and depositing his blood in those locations with his actively bleeding cut finger."[10]

¶27 Certainly, these conclusions tend to support Avery's general theory that he was framed, and their presentation may have been useful at trial. But Avery's burden in a postconviction motion is not merely to point to helpful evidence but to show how its introduction at trial could reasonably have led to a different outcome. *See* **Strickland**, 466 U.S. 668 at 694. He cannot meet this burden by misrepresenting the expert's results as "demonstrating" that he was framed. Absent additional facts or argument, we cannot assume that such measured support for Avery's frame-up theory would have led to an acquittal.

¶28 Next, Avery argues that counsel was ineffective because a blood spatter expert would have refuted the State's narrative that Halbach was thrown in the rear of the RAV4 after being fatally injured. Avery asserts that, to the contrary, Halbach "was struck on the head after she opened the rear cargo door" and was then "struck repeatedly by" a mallet or hammer—without explaining why

---

[10] For the purpose of this motion, we accept that these conclusions are based on sound methods. It is unclear, however, how this expert determined that a person actively bleeding in the RAV4 would have left a different blood pattern than what was found in Halbach's vehicle. According to the expert's affidavit referenced in the June 2017 motion, he recreated how blood could be taken from Avery's sink and selectively planted in the RAV4. The June 2017 motion states that (presumably some different) "blood spatter experiments conducted with actual blood on the subject's middle finger conclusively demonstrate that the blood would have been deposited on" additional locations within the RAV4. That experiment is not described in the referenced affidavit, however, so we do not know the methodology supporting this conclusion.

an alternative finding as to how she was killed supports his theory that he was framed.

¶29    Third, Avery contends that a blood spatter expert could have advised counsel that its trial strategy for explaining the presence of his blood in the RAV4 was flawed (i.e., that such strategy would have failed to persuade the jury).  This assertion is entirely speculative; as a matter of law, such guesswork falls well short of demonstrating ineffective assistance of counsel.

¶30    Fourth, Avery argues that counsel was ineffective for not retaining a trace materials expert, who would have found that the RAV4 key recovered from Avery's bedroom was Halbach's secondary key or subkey.  But it is, again, completely speculative to assume that the subkey was therefore planted (and not, instead, that Halbach herself was using her subkey and not her main key on the day of her death).

¶31    Avery's fifth and sixth claims concern the retention of a DNA expert.  According to Avery, such an expert would have determined that his "DNA was planted on the key" by law enforcement.  Avery again misstates the evidence. His expert analyzed DNA from "[a]n exemplar key, reportedly held by Mr. Avery as if to start a car, i.e., gripped by ungloved fingers for twelve (12) minutes."  The expert determined that ten times less DNA was deposited on the exemplar key than on the key recovered by law enforcement.  The expert further concluded that "[i]f the … key was indeed 'enhanced,' [i.e., tampered with] then it is likely that some … personal item of Mr. Avery's was used for this purpose," such as "a toothbrush or a cigarette butt."  Thus, once again, the findings of Avery's expert are significantly more ambiguous than what is presented in his motion.  We have no reason to doubt the truth of these findings (although we note that the expert did

not observe Avery holding the key), but simply determining that Avery deposited significantly less DNA in a controlled experiment does not indicate that Avery could not or did not deposit more DNA under other conditions, and it certainly does not demonstrate that law enforcement planted DNA on the key. Thus, even accepting the truth of these new findings, we cannot conclude that there is a reasonable probability that their introduction at trial would have led to a different result.

¶32 Avery's sixth claim is that counsel was ineffective for not retaining a DNA expert, who would have determined that DNA from Avery's sweaty hands "was never deposited [by Avery] on the RAV4 hood latch," demonstrating that "Mr. Avery was being framed." In what is becoming a pattern, Avery has misrepresented the facts. The DNA expert Avery has now hired did *not* determine that Avery "never deposited" the DNA and did *not* state that Avery was framed. Instead, the expert performed a series of experiments on an identical vehicle, wherein volunteers opened the car hood using the hood latch. Only four of the fifteen volunteers deposited DNA, and those four deposited significantly less DNA than present in the swab from Halbach's RAV4 hood latch. From this experiment, the expert extrapolated the possibility that law enforcement could have retrieved and relabeled a swab of Avery's groin (which was collected and discarded for exceeding the scope of a search warrant) as coming from the hood latch. The expert admitted, however, that "the convenience of this explanation … and the fact that it accounts for the physical findings observed from the analysis … does not prove evidence tampering, or more precisely, evidence reassignment." Thus, again, we are left with facts that, even if true, would not entitle Avery to relief: in a controlled experiment, the minority of volunteers who deposited sweat on the RAV4 deposited significantly less sweat than on the swab recovered by law

enforcement. There is no context to these findings—no showing of why Avery, under noncontrolled conditions, could not have deposited more sweat than the volunteers, much less any showing that the DNA was therefore planted. Without such context, this evidence is not exculpatory or even particularly relevant, and Avery's attempt to link it to the alleged reassignment of his groin swab is wholly unsupported by any facts of record.

¶33    Avery's seventh and final claim is that trial counsel was ineffective for not presenting a forensic fire expert, who would have found that Halbach's "body was not burned in the Avery burn pit and [that] her bones were therefore planted." Avery's cited factual support once again does not live up to the advance billing. His forensic fire expert did state that he "disagree[d] with [the State's expert's] opinion that the main destruction of the body took place in" the Avery burn pit. But Avery does not explain why, from this conclusion, it follows that Halbach's remains were planted, because he does not explain why he himself would have been unable to cremate some portion of Halbach's body in another location—including in his burn barrel, where additional bone fragments were found. More important, Avery does not explain where or how prejudice arises, given that his own forensic anthropologist testified to this same conclusion at trial. Avery's expert further concluded that, contrary to the State's theory at trial, Halbach's body could not have been burned to the extent it was burned in only four hours. Again, this is a fact without context; at most, presenting such evidence at trial would have enabled the jury to weigh two competing expert opinions on how Halbach was cremated. Avery again has presented no reasoned basis for concluding that the outcome of trial would have been different.

¶34    In sum, the seven ineffectiveness claims in Avery's June 2017 motion that are based on new investigations fail on the merits. Avery has not

shown that trial counsel provided objectively deficient representation by not hiring experts similar to those he later hired. Instead, Avery merely assumes that the need for such experts should have been obvious at the time, based on the later findings of his own experts. These later findings, however, are either equivocal, irrelevant, or both. In addition, Avery has not explained how these findings would have negated or undermined the cumulative effect of the other trial evidence. Thus, Avery has failed to show that, even if all these findings were admitted at trial, the result would have been different. Consequently, Avery has not alleged sufficient material facts entitling him to a hearing on his claims of ineffective assistance of counsel.

### *Brady* Violations

¶35 Avery next argues that the State withheld favorable evidence in its possession, in violation of ***Brady v. Maryland***, 373 U.S. 83 (1963). He first alleges that the State suppressed a voicemail recording that Halbach left on the answering machine of her photography client, whom she met on the same day that she visited Avery's property. Next, he alleges that the State withheld an unedited video of flyover footage of Avery's property, and instead released to Avery an edited version with just three minutes of footage. Finally, Avery argues that "investigators concealed their knowledge that [Halbach's] RAV4 was driven onto" the property of Avery's next door neighbor.

¶36 Avery does not claim that these alleged ***Brady*** violations were unknown and undiscoverable at the time of his 2013 motion or on direct appeal. His given explanation for not raising any of his new claims in 2013 is general and relates to his status as a pro se prisoner litigant; his explanation for not raising his new claims on direct appeal does not reference the ***Brady*** claims. Thus, Avery has

not overcome the procedural bar of *Escalona-Naranjo* by demonstrating a sufficient reason for not raising his *Brady* claims earlier. *See Escalona-Naranjo*, 185 Wis. 2d at 181-82.

¶37 In any case, Avery's June 2017 motion does not sufficiently allege any *Brady* violations. "A defendant has a due process right to any favorable evidence 'material either to guilt or to punishment' that is in the State's possession ...." *State v. Wayerski*, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468 (quoting *Brady*, 373 U.S. at 87). A defendant is entitled to a new trial based on the denial of such right by showing that: (1) the evidence is favorable to the defendant, either because it is exculpatory or impeaching; (2) the evidence was suppressed by the state, either willfully or inadvertently; and (3) the evidence is material. *Wayerski*, 385 Wis. 2d 344, ¶35. The standard for materiality is the same as under the prejudice prong of *Strickland*: "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. (Kevin) Harris*, 2004 WI 64, ¶14, 272 Wis. 2d 80, 680 N.W.2d 737.

¶38 Avery has not demonstrated any of the above elements for any of his claims, but what is clearest on its face is that this evidence—where it even exists—is immaterial. Avery's first claim centers on the fact that, on the day Halbach visited his property, she left a voicemail that she could not locate the residence of one of her other photography clients, whom she also visited that day. Avery argues that had this voicemail been played at trial, it would have "refuted the[] theory that [Halbach's] final appointment was [with] Mr. Avery." At trial, however, the photography client testified that, after Halbach left the voicemail on the client's answering machine, she found the client's house, took photographs, and left within fifteen minutes. Then, approximately twenty to thirty minutes after

Halbach left the voicemail (as established through her phone records), other witness testimony placed her as driving to, and then on, Avery's property. The voicemail is therefore consistent with the evidence, which is that Halbach left a voicemail, visited a client, and then visited Avery's property. There is no basis for Avery's assumption that the content of the voicemail would have refuted the State's theory about when or how Halbach was killed.

¶39 Avery's next claim is that he received an edited version of a flyover video of his property that may have contained favorable evidence. As far as we can tell, this claim is based only on Avery's unsubstantiated belief that a second video must exist because the airplane was in the air for four hours but the video he received was only three minutes long. There is no evidence of a ***Brady*** violation here because Avery merely speculates that evidence not even known to exist was suppressed.

¶40 Finally, Avery argues that investigators knew, but did not disclose to him, that Halbach's RAV4 was driven onto the property of Avery's next door neighbor. It is difficult to follow this argument, but it is based on an affidavit from the neighbor, who does *not* state that the RAV4 was on his property, but rather attests to a conversation with law enforcement agents in which *they* stated their belief as to how Halbach's vehicle was driven onto Avery's property (presumably, after Halbach's death, but the agents could have been referring to Halbach's driving route on the day of her death). Avery suggests that the information in the affidavit supports his claim that law enforcement framed him for the crime by driving the RAV4 through the neighbor's property and planting it on his. This argument is unintelligible and, in any case, we cannot perceive any ***Brady*** violation. There was no evidence here to suppress, and the facts in the affidavit are inconsequential.

24

*Newly Discovered Evidence*

¶41    Finally, Avery raises two[11] claims based on newly discovered evidence.    He contends that "new scientific evidence demonstrates that the damaged bullet … in Mr. Avery's garage was not shot through [Halbach's] head causing her death."  He also argues that, according to new tests, the swab labeled as coming from Halbach's hood latch (containing Avery's DNA) was not, in fact, taken from the hood latch.[12]

¶42    In theory, a defendant should be able to more easily overcome the ***Escalona-Naranjo*** procedural bar when basing claims on newly discovered evidence—which, after all, concern evidence not available in prior proceedings. This is not the case here, however, as is demonstrated by simply turning to the merits of Avery's claims.

¶43    To obtain a new trial based on newly discovered evidence, a defendant must show that:  "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." ***State v. Edmunds***, 2008 WI App 33, ¶13, 308 Wis. 2d 374, 746 N.W.2d 590

---

[11] A third claim repackages one of Avery's ineffectiveness claims, arguing that the results of the experiment with the RAV4 hood latch (wherein volunteers touched an identical RAV4, which was then swabbed and tested) constitute newly discovered evidence.  Avery cannot have it both ways.  Above, we assumed for the purpose of this motion that trial counsel's failure to obtain such results might constitute ineffective assistance of counsel.  We will not now analyze a claim based on the premise that these same results were undiscoverable at the time of trial.  In any case, it seems evident that trial counsel could have performed this simple experiment, so it is not apparent how the results of this experiment could constitute newly discovered evidence.

[12] This claim is based on different evidence than that forming the basis for Avery's ineffective assistance claim on this same issue.

(citation omitted).  If the defendant meets these criteria, then the circuit court must determine "whether a reasonable probability exists that a different result would be reached in a trial."  *Id.* (citation omitted).  To be entitled to a hearing on postconviction claims of newly discovered evidence, the defendant must allege sufficient material facts satisfying these elements.  *John Allen*, 274 Wis. 2d 568, ¶2.

¶44    Avery cannot meet one of more of these elements for either of his claims.  As a threshold matter, he has not shown that his purportedly "new" evidence is, in fact, new.  Avery asserts that the equipment yielding his test results was "previously unavailable," was "new technology," and/or was manufactured in 2016.  But aside from these cursory statements, Avery does not address whether technology available at the time of trial could have yielded the same results.[13]

¶45    Beyond that, Avery's evidence is largely irrelevant.  The premise of his first claim is that, if the damaged bullet found in his garage did not deliver Halbach's fatal shot to the head, then he could not be the perpetrator.  But the State never argued that either of the bullets recovered from Avery's garage killed Halbach.  At trial, the State showed that Avery's gun fired the bullet and that the bullet had Halbach's DNA on it.  But the State did not argue that this specific bullet entered Halbach's skull or killed her (nor was it necessary that it do so in order to implicate Avery in her murder).  There is nothing to suggest that shots fired into Halbach's skull were the only shots fired at her or that every bullet fired

---

[13] For example, the State points out that its trace expert at trial used the exact same technology and performed the same type of elemental analysis on charred bone fragments before trial that Avery's expert performed in 2017.  Both experts used a "scanning electron microscope with an energy dispersive x-ray analyzer" for their analysis, and there is no statement in the affidavit of Avery's expert as to why his test could not have been performed in 2006.

at her contained skull fragments—there were, after all, eleven casings and only two bullets found in the garage. The presence of Halbach's DNA on a bullet found in Avery's garage is particularly damning evidence—regardless of whether it was the bullet that entered her skull—and strongly implicates Avery absent evidence that Halbach's DNA was planted (a supposition that, even now, Avery has done little to develop). At the very least, Avery's new evidence—if it in fact is new—is consistent with the State's theory of the crime.

¶46 Avery next argues that his expert observed the hood latch swab and determined that "[s]wabs collected from the hood latches of two exemplar vehicles (a 2012 Rav 4 and a 2007 Volvo S60) each showed a considerably heavier loading of debris" than the swab from the RAV4 hood latch. The expert apparently reached this result, however, by observation alone, concluding that "[w]hereas particles on the [RAV4] hood latch swab … could only be seen with the aid of a microscope, a swab from each exemplar vehicle showed a heavy, dark streak of collected debris that is clearly visible to the unaided eye." We are left to wonder how new testing methods or equipment could possibly aid this analysis. In any event, the expert did not determine that the purported RAV4 swab "was not used to swab the hood latch," as Avery claims—much less that this swab was reassigned or otherwise used to frame Avery. There is no possibility that the presentation of this evidence would have yielded a different trial result.

*Conclusion As To The June 2017 Motion*

¶47 Because Avery has not shown that he is entitled to a hearing on any claim, we review the circuit court's denial of a hearing for an erroneous exercise of discretion. *See **Romero-Georgana***, 360 Wis. 2d 522, ¶30. We find that the court did not err in this regard. We agree with the court's assessment that, had

27

Avery's "equivocal" and "ambiguous" conclusions been introduced at trial, there would have been no reasonable probability of a different result. The circuit court appropriately exercised its discretion.

¶48 We have given Avery the benefit of several doubts as to why he did not raise these claims earlier. Even considered on the merits, the claims asserted in his June 2017 motion are speculative, conclusory, and in some cases misleading. The circuit court did not err in denying these claims without a hearing.

**MOTION #2: OCTOBER 2017 MOTION FOR RELIEF FROM ORDER**

¶49 Three days after the circuit court denied his WIS. STAT. § 974.06 motion, Avery filed a motion for relief pursuant to WIS. STAT. § 806.07(1)(a). The stated basis for the motion was that, a month prior to the court's order, defense counsel and prosecutors had agreed to additional testing of Halbach's RAV4 and of bones found in the Manitowoc County gravel pit, that the parties had agreed that Avery would amend the June 2017 motion, and that Avery "intended to inform the court that an amended motion would be filed" but "did not anticipate the court filing its order" before he could do so.[14]

---

[14] On appeal, Avery implies that the State misled him about the need to expeditiously inform the circuit court of his wish to amend/supplement the June 2017 motion. For example, Avery states, "When current postconviction counsel inquired as to whether the circuit court should immediately be informed of the agreement, [the prosecutor] stated that once he had finalized the scheduling of the RAV-4 examination … a stipulated order could be presented to the circuit court." This statement appears to be Avery's counsel's own uncorroborated description of events; there is no basis in the record for this or any related argument that the State misrepresented the postconviction process. In any case, as the circuit court explained, the State cannot determine whether and how motions to the court are amended or supplemented, and Avery had no grounds for assuming otherwise. Moreover, this argument was not presented to the circuit court and is thereby forfeited. *See* **Huebner**, 235 Wis. 2d 486, ¶¶10-12 & n.2. Accordingly, we address this point no further.

¶50    The circuit court denied the motion, explaining that, after receiving the June 2017 motion, "[n]o communication" was made "requesting that the court withhold its final decision [or] indicating that the original motion was incomplete and would be supplemented." The court acknowledged that the defense and prosecution might very well have discussed amending the June 2017 motion in anticipation of the court's granting a hearing, but

> the court was not informed of any such negotiations until after the final ruling in this matter had been issued. None of the agreements were submitted to the court for its approval until after the final decision was made in the defendant's original motion. It is for the court, and not the parties, to determine if amendments to motions previously filed will be permitted [and] to establish scheduling for matters pending before it…. Agreements should have been submitted for approval of the court prior to the final decision on the original motion being reached. The defense cannot try to amend a motion that was filed without reservation only after it receives an adverse ruling.

¶51    WISCONSIN STAT. § 806.07(1)(a) provides that the court "may relieve a party … from a judgment, order or stipulation for … [m]istake, inadvertence, surprise, or excusable neglect." We review the circuit court's decision on a motion for relief under § 806.07(1) for an erroneous exercise of discretion, meaning we will sustain the court's ruling where it applied the appropriate law to the facts on record so as to "achiev[e] a reasoned and reasonable determination." *Milwaukee Women's Med. Serv., Inc. v. Scheidler*, 228 Wis. 2d 514, 524, 598 N.W.2d 588 (Ct. App. 1999) (citation omitted).

¶52    As explained above, a movant is not entitled to an evidentiary hearing merely because he or she filed a WIS. STAT. § 974.06 motion. In the typical case, the circuit court will evaluate the facial sufficiency of the motion before ordering the State's response or scheduling a hearing. *See* § 974.06(3); *Romero-Georgana*, 360 Wis. 2d 522, ¶¶30, 37. Thus, circuit courts routinely

29

receive and deny § 974.06 motions where there is no basis for a hearing; as one would expect, courts are not required to, and generally do not, update the movant about when a decision on the motion is forthcoming.

¶53 Avery appears to acknowledge these basic principles of postconviction procedure. Nonetheless, he argues that the circuit court erroneously exercised its discretion here because, in denying his motion for relief, it ignored the existence of a 2007 order.[15] This 2007 "order on preservation of blood evidence and independent defense testing" directs the State to preserve swabs and bloodstain samples collected from the RAV4 and containing Avery's DNA, and allows such items to be submitted for independent testing "without further order of this Court."

¶54 Avery's argument with respect to the 2007 order misses the mark entirely. *Even if* all of the items the parties contemplated testing in 2017 had been described in this order, the order has no bearing on the presentation, timing, or amendment of any WIS. STAT. § 974.06 motion. The circuit court correctly concluded that it was not required to revisit its decision on the June 2017 motion upon being belatedly informed that Avery wished to amend that motion. Thus, the court did not erroneously exercise its discretion in declining to vacate an order adverse to Avery so as to allow amendment of "a motion that was filed without reservation."

---

[15] The State argues that this argument was forfeited because it was raised for the first time on appeal. We agree that, at the very least, the argument was not well developed below. For completeness, however, we will exercise our discretion to address this argument on the merits. *See **Huebner**, 235 Wis. 2d 486, ¶¶10-12 & n.2.

## MOTION #3:  OCTOBER 2017 MOTION FOR RECONSIDERATION

¶55     Shortly after filing his WIS. STAT. § 806.07 motion, Avery filed a motion to reconsider.[16]    As relevant to this appeal,[17] he alleges that newly discovered evidence warrants reconsideration of the court's denial of his June 2017 motion.

¶56     A party may prevail on a motion for reconsideration by presenting newly discovered evidence, but such motion is not a platform "to introduce new evidence that could have been introduced" as part of the original proceeding. ***Koepsell's Olde Popcorn Wagons, Inc. v. Koepsell's Festival Popcorn Wagons, Ltd.***, 2004 WI App 129, ¶¶44, 46, 275 Wis. 2d 397, 685 N.W.2d 853.  The term "newly discovered" presupposes that the evidence was unknown at the time of final judgment—that is, it was not under the control or knowledge of the movant, or discoverable by reasonable diligence.  *See **id.***, ¶¶46-48.  "We review a trial

---

[16]  The motion to reconsider was followed by several subsequent "supplements," in which the motion was revised.  For convenience, we discuss these as a single motion.

[17]  In addition to the arguments addressed in this section, Avery's motion for reconsideration argues that the circuit court made manifest errors of fact and law in denying his June 2017 motion.  We review the June 2017 motion in the first portion of this decision and conclude that the court did not err, except as noted in this footnote.  Therefore, we address in this section only those arguments based on claims of newly discovered evidence.

In its decision on the June 2017 motion, the circuit court mischaracterized Avery's allegations relating to ineffective assistance of postconviction counsel.  Avery raised these allegations so as to explain why his claims were not procedurally barred by ***Escalona-Naranjo,*** 185 Wis. 2d 168, 517 N.W.2d 157 (1994) (that is, why he did not raise his claims on direct appeal).  The circuit court misconstrued Avery to allege ineffective assistance of *appellate* counsel and concluded that Avery was required to file a ***Knight*** petition with this court in order to do so.  *See **State v. Knight***, 168 Wis. 2d 509, 484 N.W.2d 540 (1992).  On appeal, Avery correctly points out that this was an error.  Regardless, our review of the sufficiency of the June 2017 motion is de novo, and we conclude that Avery did not demonstrate ineffective assistance of postconviction counsel.  Therefore, the circuit court's error was harmless.

court's decision on a motion for reconsideration under the erroneous exercise of discretion standard." *Id.*, ¶6.

¶57 A motion to reconsider on the basis of new evidence would seem to be of doubtful utility in cases, like this, where the movant is free to file successive motions. *See* WIS. STAT. § 974.06(2), (4). Nonetheless, we perceive no legal barrier to Avery's bringing such a motion, and the State does not argue as much, except to point out that this motion cannot be the means of avoiding the procedural bar of *Escalona-Naranjo*. In this context, to be entitled to reconsideration on the basis of newly discovered evidence, the movant must show that the evidence was unknown and not reasonably discoverable when the first § 974.06 motion was filed and that the evidence reasonably relates to those claims brought in the first motion. *See* ***Koepsell's Olde Popcorn Wagons, Inc.***, 275 Wis. 2d 397, ¶¶44, 46-48. Alternatively, the movant may simply bring a new § 974.06 motion and demonstrate his or her "sufficient reason" for not raising the claim in the prior § 974.06 motion by showing that the evidence underlying that claim was then unknown and not reasonably discoverable.

¶58 Avery makes no showing in his motion to reconsider as to why he could not, with reasonable diligence, have included this "new" evidence in his June 2017 motion. Instead, he uses this third motion as a vehicle for raising new claims. None of these claims or evidence, however, have any bearing on the claims raised in the June 2017 motion, so it is unclear which *original claims* the circuit court was being asked to reconsider, or why. In any case, the majority of this evidence cannot reasonably be considered unavailable or undiscoverable at the

time Avery filed his June 2017 motion.[18]  Nor, if we simply treat this motion as a new WIS. STAT. § 974.06 motion, does Avery demonstrate why these claims are

[18] Avery's motion for reconsideration raises claims based on evidence that cannot reasonably be considered "newly discovered" (i.e., unavailable and not discoverable through reasonable diligence at the time of the June 2017 motion).  *See* *Koepsell's Olde Popcorn Wagons, Inc. v. Koepsell's Festival Popcorn Wagons, Ltd.*, 2004 WI App 129, ¶¶44, 46-48, 275 Wis. 2d 397, 685 N.W.2d 853.  Therefore, we will not address these claims further, except to list and briefly discuss them here.  These are that:  (1) the State withheld evidence that Halbach's vehicle was seen on the street days after her disappearance (claim based on 2017 affidavit of witness attesting that, in 2005, he observed a vehicle matching a missing person's poster description of Halbach's car and informed law enforcement of that fact, but with no showing that Avery was unable, through reasonable diligence, to discover this information prior to filing the June 2017 motion); (2) trial and postconviction counsel were ineffective for not presenting impeachment testimony on key witnesses, or, in the alternative, the State violated Avery's right to due process by knowingly using false testimony at trial (claims based on evidence collected at the time of Halbach's disappearance and presumably known to Avery at the time of trial, with no representation that Avery learned of this evidence only after filing the June 2017 motion and could not reasonably have discovered it earlier); (3) there is another possible suspect meeting the *Denny* test (claim based on evidence showing how long it takes to drive away from Avery's property); (4) there is another possible suspect meeting the *Denny* test (claim based on evidence gathered by examining images found on a computer; Avery states that the computer search was the result of "2017 technology" but does not explain whether technology available earlier would have uncovered these images or why, through reasonable diligence, he could not have uncovered these images prior to filing the June 2017 motion); (5) alleged *Brady* violation based on 2005 evidence purportedly withheld, concerning who might have had possession of Halbach's day planner after her death (Avery does not explain when he received this evidence or why it was not reasonably discoverable prior to June 2017); (6) there is another possible suspect meeting the *Denny* test (claim based on statements made to police in 2005 about Avery's sister, and not Avery, requesting that Halbach photograph a car on Avery's property, but with no showing that this evidence was unknown or not reasonably discoverable prior to June 2017); (7) there is another possible suspect meeting the *Denny* test (based on evidence that Avery's sister attempted to hide files on her computer that might link her son to the crime; this information was reported to the police prior to trial and Avery does not allege that he was unaware of this evidence at trial or explain why the evidence was not reasonably discoverable prior to June 2017).  Motion #3 also contains arguments that are the subject of Motion #4, and which we will therefore discuss in the following section.

Because these claims were brought in a motion to reconsider, we conclude only that the circuit court did not erroneously exercise its discretion in declining to revisit the June 2017 motion in light of the content of this motion.  Neither we nor the circuit court have squarely considered whether these claims are procedurally barred under *Escalona-Naranjo* or whether Avery pled sufficient material facts entitling him to a hearing (although our analysis overlaps with the former inquiry).  Such consideration would have to come on a separately filed WIS. STAT. § 974.06 motion, and we express no opinion as to whether such claims would be barred in the event such a motion is filed.

not procedurally barred under *Escalona-Naranjo* (setting aside the question of why the claims were not alleged in the June 2017 motion, Avery has not explained why they were not alleged in the 2013 motion or on direct appeal).[19]

¶59     We do note that buried in the motion are two claims based on evidence that appears on the face of the claims to be "newly discovered." According to Avery, in October 2017, his sister, Barb Tadych (who lived on the Avery property and whose son, Bobby Dassey, Avery identifies as an alternative suspect in the crime) told him two pieces of information that would impeach her son's testimony about last seeing Halbach walk toward Avery's trailer on the day of her disappearance.  In Avery's view, his sister "admitted that she knew that [Halbach] had left the property" on the day in question.  This evidence, however, is equivocal and does not clearly establish that Halbach in fact left the property on the day of her death or that any witness was aware of or lied about this fact at trial.[20]  Moreover, the evidence does not bolster any claim in the June 2017 motion

---

[19] On appeal, Avery inexplicably argues that the State is "estopped from raising … procedural bar arguments" relating, presumably, to *both* this October 2017 motion to reconsider *and* his earlier June 2017 motion—based on the sole fact that the State represented in September 2017 that it would not oppose amendment of the June 2017 motion.  Assuming without deciding that the doctrine of estoppel might apply to the postconviction process under some circumstances, here, the State's representation clearly had no bearing on a motion already filed and, as a matter of law, could not relieve Avery of his burden in any subsequent WIS. STAT. § 974.06 motion to demonstrate why newly raised claims were not procedurally barred.

[20] The first piece of evidence is recorded statements in an October 2017 phone call between Avery and Barb Tadych and her husband, Scott Tadych.  Avery identifies the full relevant portion of the transcript as follows:

> Steven Avery:  Bobby's home.
> Barb Tadych :  He wasn't always home.
> Steven Avery:  Well, you—well, most of the time he was home.
> Barb Tadych :  No.
> Scott Tadych:  He doesn't know fucking shit.
> Steven Avery:  And he said he [sic] left.  She left.
> Scott Tadych:  That's right.

<span style="float:right">(continued)</span>

so as to warrant reconsideration of that motion. Even viewed on its own merits, the evidence does not entitle Avery to a WIS. STAT. § 974.06 hearing because he has not shown that it is material. *See Edmunds*, 308 Wis. 2d 374, ¶13. At best, we have two unsworn statements by Barb Tadych that Dassey told *her* something that is potentially inconsistent with his trial testimony. This is hearsay that would be inadmissible at a new trial, meaning that it cannot constitute newly discovered evidence as a matter of law. *See State v. Bembenek*, 140 Wis. 2d 248, 253, 409 N.W.2d 432 (Ct. App. 1987).

¶60 Avery chose to frame these claims in the context of a motion to reconsider, but without applying that legal standard or (in the alternative) explaining why he had a "sufficient reason" for not bringing the claims in previous motions, pursuant to *Escalona-Naranjo*. As discussed in the above section on the

---

| Barb Tadych : | Yeah, she left. |
| Steven Avery: | Yeah. |
| Barb Tadych : | Yeah. |
| Steven Avery: | Well, he didn't testify for [sic] that. |
| Barb Tadych : | [sighs] |

The second piece of evidence is an October 2017 posting on Barb Tadych's Facebook page. Avery identifies the full relevant portion of the posting as follows:

| Barb Tadych: | Well I have your answer for all of you that was wondering, just got off the phone with Bobby and I asked him and he told me that: He seen her [presumably, Halbach] pull in but that was it because he left to go hunting then. He said that is the truth. |
| [Commenter or Facebook friend]: | so he never seen her walk towards steven home |
| Barb Tadych: | No. |

June 2017 motion, we are willing to give Avery the benefit of the doubt, where possible, as to why he did not raise certain claims in 2013 or on direct appeal. But we cannot ignore the law, and thus we cannot simply determine whether the merits of his motion-to-reconsider claims warrant an evidentiary hearing, where the only (narrow) question before us is whether the circuit court erroneously exercised its discretion in not reconsidering *the June 2017 motion* on the basis of purported new evidence contained within those claims.[21]

¶61     We conclude that the circuit court did not erroneously exercise its discretion in denying this motion. The court noted that Avery provided no explanation for filing the June 2017 motion while "considerable investigation was still being conducted by the defense":

> Knowing that not all the facts were … ready for presentation to the court, and with no deadline for filing his motion set by the court or statute, the defendant proceeded to file the motion prematurely....
>
> The motion was pending before this court for a few months before the court issued its ruling. During that period, the defendant did not ask the court to stay its ruling pending the conclusion of testing, request time to supplement the motion or take any other action requesting that the court delay its final decision in this matter. The motion was submitted to this court and the court ruled on the motion.

---

[21] Although the merits of these claims are not properly before us, we have reviewed them in our broader review of this appeal. We note that the evidentiary basis for some of these claims is lacking. For example, one claim is based on Avery's assertion that Ryan Hillegas, Halbach's ex-boyfriend, later possessed a day planner that was in her car on the day of her death. The evidence Avery submits, however, does not and cannot reasonably be construed to support this conclusion. Moreover, other claims do not appear on their face to entitle Avery to a hearing. For example, one claim, as far as we can tell, is based on a recreation of what Halbach's movements would have been had she driven away from Avery's property on the date of her death. From this experiment—which is unsupported by any explanation as to how Avery might prove the underlying hypothetical scenario, that Halbach did in fact leave—Avery seeks to implicate Bobby Dassey and Scott Tadych, his brother-in-law, in Halbach's murder.

This explanation is reasonable and sound, and represents an appropriate exercise of discretion.

## MOTION #4: JULY 2018 SUPPLEMENTAL MOTION

¶62    Avery appealed from the circuit court's October 2017 and November 2017 orders denying his June 2017 motion and his motions to vacate and reconsider, respectively.   In May 2018, Avery moved this court directly "to supplement the Record on Appeal with a CD disclosed to Defendant for the First time on April 17, 2018."   Avery asserted that supplementation of the appellate record was appropriate because the contents of the CD related to claims already presented to the circuit court.   We stated that this assertion "misses the point, which is that we are not a fact-finding court and cannot consider items not presented to the circuit court."   We determined, however:

> Based on the assertion that Avery recently received previously withheld discovery or other new information, we retain jurisdiction but remand this case to enable Avery to file an appropriate supplemental postconviction motion in the circuit court … within thirty days of the date of this order.   The circuit court shall hold proceedings on the supplemental postconviction motion within sixty days after the motion is filed.

¶63    In July 2018, Avery filed his motion to supplement (the July 2018 motion), alleging a ***Brady*** violation.[22]    Recall that, prior to trial, Avery unsuccessfully moved to introduce third-party liability evidence, pursuant to ***State v. Denny***, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984).   In his July 2018

---

[22] The State points out that a motion already decided (i.e., the June 2017 motion) cannot be "supplemented" and that, therefore, the July 2018 motion is a successive motion.   Regardless, this court has determined and ordered that the July 2018 motion (as well as the subsequent March 2019 motion, or Motion #5) shall be treated as a supplement to the June 2017 motion.

motion, Avery alleges that the State withheld significant evidence both favorable to his *Denny* motion and relevant for impeachment purposes: a final investigative report of Detective Mike Velie, saved on a CD (the Velie CD). Velie created the report through forensic examination of the hard drive of a computer used by Dassey, whom Avery identifies as a possible *Denny* suspect. The Velie CD contains "thousands of images" of violent pornography that, Avery argues, "reveal a propensity for sexual violence" by Dassey (Avery elsewhere attempts to explain why, of several people who used the computer, only Dassey could have downloaded these images). The CD also contains "a timeline" that purportedly "impeaches [Dassey's] trial testimony" and "criteria, word searches, registry, recovered pornography, internet history, windows registry, and all MSN messages." According to Avery, he did not receive the Velie CD until April 2018.

¶64 The circuit court determined that there was no *Brady* violation because there was no evidence suppressed. We agree.[23] It is undisputed that the computer was examined and its contents copied to seven DVDs. It is undisputed that Avery's counsel received these seven DVDs prior to trial. Finally, it is undisputed that, with limited and irrelevant exception,[24] the Velie CD does not

---

[23] As this claim was to be treated as a supplemental motion, pursuant to this court's order, Avery was not required to allege a "sufficient reason" under *Escalona-Naranjo* for not raising the claim in his June 2017 motion. We assume without deciding that Avery had a sufficient reason for not raising this claim in his 2013 motion or on direct appeal, based on the purported unavailability of the evidence.

[24] Velie attests:

> The only information on the CD titled "Dassey computer, Final Report, Investigative Copy" that is not contained in the 7 DVDs would be the typical administrative and procedural files, folders, and techniques routinely used by a digital forensic examiner during a forensic examination of digital evidence.

(continued)

contain any additional information than what is on the seven DVDs. Consequently, the Velie CD is not suppressed evidence but merely an investigative summary of evidence provided to Avery.

¶65    Avery appears to acknowledge these facts on appeal but argues that he should have had access to information derived from Velie's "unique word searches," pornographic images "refined" for relevancy, and the like. This is not the law: *Brady* on its terms applies to favorable and material suppressed *evidence*, and Avery has presented no authority extending this principle to the prosecution's withholding of *secondary compilations or analyses* of such. *See United States v. McGuinness*, 764 F. Supp. 888, 896 (S.D.N.Y. 1991) ("*Brady* applies only to facts that are not already known to the defendant. The government need not facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshall on their own." (citations omitted)).

---

Avery's computer expert attests that Avery did not receive "critical information" about *how* Velie analyzed the computer but does not conclude that the Velie CD contains additional information not provided to Avery:

> In my opinion, based upon a reasonable degree of certainty in the field of computer forensic science, the CD contains information and files extracted from the 7 DVDs that, in Detective Velie's opinion, were relevant to the investigation of Ms. Halbach's murder.

> While the information contained on the CDs is derived from the forensic image contained across the DVDs, trial defense counsel was not provided critical information including *the criteria used* by Detective Velie in performing his forensic computer examination as well as *the results of that examination*.

(Emphasis added.)

¶66    Avery raises two related arguments concerning the disclosure of the DVDs themselves.  He argues that the State deliberately misled him about the importance of the DVDs by stating in an email that they "did not include much of evidentiary value."  Even if this statement mischaracterized the evidence, however, an off-the-cuff description of disclosed evidence cannot form the basis for a *Brady* violation.  Avery further argues that he was only provided the DVDs approximately one month before his *Denny* hearing, leaving him "completely impaired" in his ability to introduce relevant evidence in that proceeding.  But this argument properly concerns alleged ineffective assistance of trial counsel (see below), because such conclusory statements do not adequately explain why trial counsel could not have analyzed the DVDs in time for the motion hearing, sought to postpone the hearing, or taken any number of other steps to effectively leverage this evidence.

¶67    In the July 2018 motion, Avery does indeed argue that trial counsel was ineffective for failing to forensically examine the seven DVDs prior to trial.  He does so summarily, however, and in a manner that leaves us unable to meaningfully analyze this claim.  Regarding potential use of this evidence in his *Denny* motion, Avery does not address the prejudice prong of the *Strickland* test, which, in our view, encompasses at least two key inquiries.  To admit evidence at trial that Dassey could have killed Halbach, Avery would have had to provide some evidence at the pretrial *Denny* hearing *directly connecting* Dassey to the crime.  *See State v. Scheidell*, 227 Wis. 2d 285, 296, 595 N.W.2d 661 (1999) (evidence that another party committed the crime may be admissible pursuant to *Denny* if the defendant can show:  (1) the third party's motive, (2) the third party's opportunity to commit the crime, and (3) some evidence directly connecting the third party to the crime). That Dassey possibly possessed violent pornographic

images might have conceivably satisfied a separate requirement, motive, but is insufficient in and of itself to allow admission of third-party liability evidence.[25] *See id.* Avery failed to meet the "direct connection" requirement in his original *Denny* motion and has not presented additional evidence on this point in Motion #4. Thus, even assuming trial counsel was deficient in not analyzing the DVDs, Avery cannot demonstrate a reasonable probability of a different outcome at the *Denny* hearing or at trial.[26] *See Strickland*, 466 U.S. at 694.

¶68    Regarding the use of this evidence for impeachment purposes, even accepting that the CD contains "a timeline that impeaches [Dassey's] trial testimony" (we are skeptical of this point, *see* note 25), Avery does not explain how impeaching Dassey about his use of the computer would have changed the

---

[25] Although only tangentially relevant to our decision, we note that Avery's counsel misrepresented some key facts underlying this claim in the motion to the circuit court and briefing to this court. Avery asserts that only Dassey could have downloaded the images, created folders containing photographs of Halbach, and "search[ed] for key terms relevant to the murder." He states that Dassey "was the only individual at home" when this computer activity took place, but references for support only the affidavit of his computer expert, who does not and cannot opine on Dassey's schedule, and a sheriff's department interview with Dassey containing none of this information. Avery also characterizes the pornographic images as "bear[ing] a striking resemblance to [Halbach] and to the nature of the crime committed against her." As far as we can tell, there is no support for this conclusion in the evidence on record. That Avery misrepresented the facts is immaterial to deciding his *Brady* and ineffectiveness claims. We point them out because of the high-profile nature of this case, the greater possibility that interested members of the public will read the briefing and motions, and the resulting need, where misrepresentations are particularly egregious, to note where Avery's arguments wholly stray from the facts.

[26] As discussed below, we are not addressing Avery's most recent filing to *this* court (see our discussion of Motion #6), which seeks to directly connect Dassey to Halbach's murder. If Avery wishes to raise that claim, he will need to bring a new WIS. STAT. § 974.06 motion. That motion would need to survive both *Escalona-Naranjo* scrutiny *and* be found to have merit—in which case, the evidence presented might supply the missing "direct connection." In that event, the Velie CD evidence might become relevant to showing Dassey's motive, and might bear on whether Dassey is, or should have been, a viable *Denny* suspect. We express no opinion on the merit of any such § 974.06 motion, as all such issues would be for the circuit court to decide in the first instance.

outcome of the trial. At most, the jury would have disbelieved Dassey's testimony that, on the day Halbach last visited the Avery property: he saw Halbach walk towards Avery's trailer, he did not see her leave the property, Halbach's RAV4 was in the driveway when he left to go hunting, and the RAV4 was gone when he returned several hours later (Avery identifies these as the key pieces of testimony). Certainly, this testimony bolstered the State's theory that Halbach visited Avery on that day and did not leave the Avery property thereafter, but absent this testimony, the State still possessed significant forensic (and other) evidence implicating Avery in a crime committed on his property. Without any showing or argument as to why the impeachment of Dassey would have undermined the cumulative effect of the other evidence, we cannot conclude that the trial's outcome would have been different. We conclude that the circuit court did not err in denying the July 2018 motion without a hearing.

### MOTION #5: MARCH 2019 SUPPLEMENTAL MOTION

¶69 In January 2019, Avery again moved this court directly to stay the appeal and remand for the circuit court's consideration of specific claims relating to the State's 2011 release to Halbach's family of suspected human bone fragments. We determined that, "given the specific circumstances of this case," we would stay the appeal and remand, pursuant to WIS. STAT. § 808.075(5), for action on this issue. We again ordered remand to the circuit court to permit Avery to pursue a supplemental postconviction motion on specific claims, and we directed the court to conduct any necessary proceedings. The circuit court denied the motion without a hearing.

¶70 The gist of Motion #5 is that the State released to Halbach's family suspected human bone fragments recovered from the Manitowoc County gravel

pit, thereby violating: (1) a circuit court order; (2) WIS. STAT. § 968.205, requiring the state to preserve certain biological material evidence connected to a criminal conviction; and (3) Avery's constitutional rights. As a WIS. STAT. § 974.06 motion may raise only jurisdictional, constitutional, and like claims, we consider only the third argument. *See* § 974.06(1); *Balliette*, 336 Wis. 2d 358, ¶34; *State v. Carter*, 131 Wis. 2d 69, 81-82, 389 N.W.2d 1 (1986).

¶71 Avery alleges that, in 2011, the State improperly released to Halbach's family bone fragments from the gravel pit, which Avery wished to test to determine if they contained Halbach's DNA and might thereby indicate that Halbach was not killed on Avery's property. Avery argues that "[t]he State, by its actions in returning [the] bones … has implicitly admitted that the bones were not only human but that they belonged to Ms. Halbach." Avery frames this as a violation of *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1998), under which a defendant's due process rights are violated where the state either (1) fails to preserve "apparently exculpatory" evidence or (2) acts in bad faith by failing to present "potentially exculpatory" evidence. *See State v. Greenwold*, 189 Wis. 2d 59, 67-68, 525 N.W.2d 294 (Ct. App. 1994).

¶72 Avery represents that he was not aware, and could not reasonably have been aware, of the release of the bones until after he filed his fourth motion. We will assume, therefore, that this claim is not procedurally barred under *Escalona-Naranjo*.

¶73 The State argues that the *Youngblood* analysis only properly applies to the destruction of pretrial evidence. We agree generally but need not explore this point, because Avery's claim fails on its own terms.[27]

¶74 The premise of Avery's argument is that the State released to Halbach's family evidence that was either apparently or potentially exculpatory: bone fragments from the gravel pit that may have been Halbach's. This evidence, when first collected, was labeled as containing some human bone fragments. At trial, however, the undisputed testimony of the State's forensic anthropologist was that, on further analysis, the bone fragments could not be definitively identified as human, much less as belonging to Halbach. On this record, therefore, this evidence is not apparently exculpatory: it does not indicate that another person killed Halbach. *See Youngblood*, 488 U.S. at 56 n.* (evidence is not "apparently exculpatory" where those having custody over it did not know of its exculpatory

---

[27] *Youngblood* and progeny concern whether the destruction of pretrial evidence violates a defendant's due process right to a fair trial, the remedy being dismissal of charges. *See Arizona v. Youngblood*, 488 U.S. 51, 54-58 (1998); *State v. Greenwold*, 189 Wis. 2d 59, 65-69, 525 N.W.2d 294 (Ct. App. 1994). We recognize that *State v. Parker*, 2002 WI App 159, ¶¶13-14, 256 Wis. 2d 154, 647 N.W.2d 430, somewhat summarily states, "We see no reason why this line of cases [addressing the pretrial destruction of evidence] should not apply to the situation at hand"—that situation being the destruction of evidence posttrial but before the direct appeal was concluded. As there the defendant's argument was merely that the destruction of evidence deprived him of his *right to appeal* and the *right to effective assistance of appellate counsel*, it appears that the *Parker* court was simply noting a potential constitutional violation separate and apart from any *Youngblood* violation. *Parker*, 256 Wis. 2d 154, ¶4. We do not readily perceive how *Youngblood* itself—concerning the right to a fair trial and dismissal of charges as a potential remedy—applies to a claim brought on a collateral attack. We agree with the State that *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52, 67-72 (2009), supports this conclusion; there the United States Supreme Court found that respondent did not have the same due process right in the postconviction context to access evidence in control of the state. *See Reid v. State*, 984 N.E.2d 1264, 1267 (Ind. Ct. App. 2013) ("*Osborne* … indicates that an individual does not have a right under the Due Process Clause to access lost or destroyed evidence during post-conviction proceedings." (citation omitted)). Because Avery has not alleged a *Youngblood* violation, we need not delve more fully into this point.

value and the evidence "was simply an avenue of investigation that might have led in any number of directions").

¶75     Nor can Avery establish that this evidence is potentially exculpatory, because even assuming that these bone fragments are Halbach's, Avery does not explain the significance of this fact.  The apparent thrust of Avery's claim is that, if Halbach's bones were found in the gravel pit, then she was killed by someone else.  But as Avery never explains why he himself would have been unable to dispose of Halbach's remains in the gravel pit, this line of reasoning is wholly speculative.  Moreover, Avery cannot show bad faith, meaning "(1) the officers were aware of the potentially exculpatory value or usefulness of the evidence they failed to preserve; and (2) the officers acted with official animus or made a conscious effort to suppress exculpatory evidence."  *See State v. Luedtke*, 2015 WI 42, ¶46, 362 Wis. 2d 1, 863 N.W.2d 592 (citation omitted).  The record reflects only that the State released bone fragments of indeterminate origin after Avery's direct appeal was fully litigated, when there appeared no direct or immediate need to preserve this evidence.  And contrary to Avery's argument, the very fact that the State released the bones does not mean that these are Halbach's or that the State acted in bad faith to "destroy" this evidence.  The Halbach family requested these bone fragments for purposes of its own—likely for closure—but that does not vest these fragments with evidentiary significance.[28]

---

[28]  Avery suggests that the State also acted in bad faith in 2018, during the postconviction process, by actively misleading him about whether it still possessed the bone fragments.  The point at which to measure the State's bad faith, however, is when it allegedly destroyed the evidence—here, in 2011, when it released the bone fragments to Halbach's family.  *See State v. Luedtke*, 2015 WI 42, ¶41, 362 Wis. 2d 1, 863 N.W.2d 592 (defendant must show that "the State acted in bad faith *by destroying evidence* that was potentially exculpatory" (emphasis added; citations omitted)).

**MOTION #6: APRIL 2021 MOTION TO STAY AND REMAND**

¶76 On November 9, 2020, we notified the parties that this case had been submitted to the court for decision on briefs. On April 12, 2021, Avery filed another motion with this court to stay his appeal and remand for evaluation of a new claim. This claim concerns an alleged *Brady* violation, the factual basis for which Avery purportedly obtained on April 11, 2021. Specifically, the claim is based on the affidavit of Thomas Sowinski, a Manitowoc motor route driver who attests that, days after Halbach's death, while on his paper route in the early morning hours, he spotted a shirtless Dassey and an unidentified older man pushing Halbach's vehicle down Avery Road towards the junkyard. Sowinski further attests that, after he delivered the paper, Dassey attempted to block his exit, causing him to swerve and drive into a shallow ditch. Sowinski claimed to have called the Manitowoc sheriff's office later that day to report what he had seen but was told they "already know who did it." He also claims to have attempted to contact Avery's trial attorneys after Season 1 of Making a Murderer, but never heard back from them.

¶77 When Avery filed this motion, we had already twice stayed his appeal, each time because he asserted that the new claims related to those previously litigated and that it would be most expeditious to resolve them as part of the instant appeal. By the time Avery filed this new motion, however, we had already evaluated the legal and factual bases for claims already raised. We therefore were, and are, in the position to conclude that this newly raised *Brady* claim bears little or no relation to those claims already before us. This is, instead, a distinct issue that the circuit court should resolve on a standalone basis through a new WIS. STAT. § 974.06 motion.

46

¶78     Moreover, Avery's latest motion arrived while our decision on his appeal was forthcoming.  It would be an inefficient use of court resources to now, and once again, delay this appeal's resolution.  We appreciate that Avery likely wishes us to consider this new ***Brady*** claim in the context of claims previously raised, but we must weigh that implicit consideration against those discussed above.  Simply put, Avery's appeal cannot continue indefinitely.  Accordingly, this decision operates as an order denying Avery's April 12, 2021 motion to stay and remand.  If Avery wishes to raise this claim, he must file a new WIS. STAT. § 974.06 motion with the circuit court.  Pursuant to ***Escalona-Naranjo***, Avery will need to demonstrate why he could not have previously raised this claim, including in his June 2017 motion, before the merits can be reached.

## CONCLUSION

¶79     Avery raises a variety of alternative theories about who killed Halbach and how, but as the State correctly notes, a WIS. STAT. § 974.06 motion is not a vehicle to retry a case to a jury.  A criminal defendant is constitutionally entitled as of right to a jury trial and, if convicted, a direct appeal.  If he or she later seeks to collaterally attack the conviction on constitutional or jurisdictional grounds, a § 974.06 motion is appropriate.  But key to any § 974.06 motion are sufficient, nonconclusory showings both as to why the issue was not raised in an earlier postconviction proceeding *and* why the claim has facial merit.  These requirements are not optional and cannot be met through broad conclusions or by misstating evidence.

¶80     We express no opinion about who committed this crime:  the jury has decided this question, and our review is confined to whether the claims before us entitle Avery to an evidentiary hearing.  We conclude that the circuit court did

not erroneously exercise its discretion in denying hearings on Motions #1, #4, and #5; in not vacating its order on Motion #1; and in not reconsidering its ruling on Motion #1. As for Motion #6 and the portion of Motion #3 (the motion to reconsider) raising new claims, we leave open the possibility that Avery may raise these claims in a new WIS. STAT. § 974.06 motion. We remind Avery, however, that he will need to overcome the ***Escalona-Naranjo*** procedural bar on these claims, which includes providing a sufficient reason for not raising them in his June 2017 motion. Moreover, Avery will need to satisfy the previously discussed specificity requirements before such claims may proceed to a hearing. *See **John Allen***, 274 Wis. 2d 568, ¶¶2, 23.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.